# EXHIBIT A

DR. MITCHELL CHASIN

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
                 DISTRICT OF NEW JERSEY
 2           CASE NO. 3:16-cv-08523-FLW-TJB

 3

 4

 5   NEW REFLECTIONS PLASTIC        :
     SURGERY, LLC,
 6                                   :      VIDEOTAPED
                 Plaintiff,              DEPOSITION OF:
 7                                   :
     -against-                         MITCHELL CHASIN,
 8                                   :            M.D.
     REFLECTIONS CENTER FOR SKIN
 9   AND BODY, PC,                   :
10                 Defendant.        :
     _____X
11
12
13
14
15          TRANSCRIPT of testimony as taken by and
16   before SEVA FLICSTEIN, Certified Court Reporter,
17   Registered Merit Reporter, Certified Realtime
18   Reporter, at the law offices of LERNER DAVID
19   LITTENBERG KRUMHOLZ & MENTLIK, LLP, located at
20   600 South Avenue West, Westfield, New Jersey, on
21   Thursday, November 2, 2017, commencing at 2:04
22   in the afternoon.
23
24
25
```

DR. MITCHELL CHASIN

Page 2

```
 1   A P P E A R A N C E S:

 2

 3        MEREDITH & KEYHANI, PLLC
          BY:  DARIUS KEYHANI, ESQ.
 4        205 Main Street
          East Aurora, New York  14052-1634
 5        dkeyhani@meredithkeyhani.com
          212-380-1325
 6        Attorneys for Plaintiff

 7

 8

 9        LERNER DAVID LITTENBERG
          KRUMHOLZ & MENTLIK, LLP
10        BY:  GREGG A. PARADISE, ESQ.
          600 South Avenue West
11        Westfield, New Jersey  07090
          gparadise@ldlkm.com
12        908-654-5000
          Attorneys for the Defendant

13

14

15

16

17

18

19

20

21

22

23

24

25
```

DR. MITCHELL  CHASIN

Page 8

1    lunch.

2            A.    I came an hour before and spoke

3    with my attorney.

4            Q.    Did you review any documents in

5    preparation for the deposition today?

6            A.    Review any documents.  He did not

7    present me with any documents to look at, no.

8            Q.    Well, I guess my question was did

9    you look at any documents?  Whether it was with

10   him or by yourself in preparing --

11           A.    Some of the things we sent to you,

12   such as our profit and loss statement, I had in

13   front of me, my own records.  But the attorneys

14   did not present me with any documents to review.

15           Q.    Besides the profit and loss

16   statements that you mentioned, anything else you

17   reviewed in preparation for this deposition?

18           A.    No, no.

19           Q.    Do you understand that you are

20   appearing today at this deposition in your

21   individual capacity, and also as the designated

22   30(b)(6) witness on behalf of your company

23   Reflections Center for Skin and Body?  Do you

24   understand that?

25           A.    Yes.

DR. MITCHELL CHASIN

Page 19

1          Q.     And pricing of your products and

2     services, of course, I think are covered by some

3     of the other topics as well.

4          A.     Also supplied to you.

5          Q.     Yes.  Thank you.

6                 I would like to get a little bit

7     of background, some of your background, on the

8     record.  Can you tell me when you graduated from

9     medical school, what year?

10         A.     1985.

11         Q.     And you did your -- you did a

12    residency after that?

13         A.     Yes.

14         Q.     And where did you do your

15    residency?

16         A.     At Overlook Hospital.

17         Q.     Where is that located?

18         A.     Summit, New Jersey.

19         Q.     And what was the focus of your

20    residency?

21         A.     Family medicine.

22         Q.     Did you do any fellowships after

23    that or any other additional training?

24         A.     Lots of training.

25         Q.     What did you do after your

DR. MITCHELL  CHASIN

Page 20

1    residency in family medicine?

2         A.     We opened up a private practice.

3         Q.     "We" is who?  You and --

4         A.     Partner and I.

5         Q.     Who is your partner?

6         A.     Ian Brodrick.

7         Q.     How do you know Ian?  How do you

8    know Brodrick?

9         A.     How do I know him?

10        Q.     Yes.

11        A.     Presently?

12        Q.     No.  Back at that time.

13        A.     How did I meet him?  I don't --

14        Q.     How do you know him?  How did you

15   get to know him?

16        A.     We trained together.

17        Q.     In residency?

18        A.     Yes.

19        Q.     Is he also a family doctor?

20        A.     Yes.

21        Q.     Just the two of you opened the

22   practice?

23        A.     Yes.

24        Q.     Are you guys friends?

25        A.     Define what that means.  I

DR. MITCHELL CHASIN

1    don't --

2              Q.    Do you have a relationship -- did

3    you or do you have a relationship outside of

4    work together?

5              MR. PARADISE:   Objection to form.

6    You can answer.

7              A.    Do I have a relationship --

8              Q.    A social relationship?

9              A.    Not actively, no.

10             Q.    Did you have at one time a social

11   relationship?

12             A.    Business partners.

13             Q.    That's it?

14             A.    Business partners.

15             Q.    My question is that is it?  Just

16   business partners?

17             A.    Define "social relationship,"

18   please.

19             Q.    Did you spend time together

20   outside of the work environment relating to work

21   activities?

22             A.    Related to work activities, if

23   there were outings related to work activities.

24   But there was no --

25             Q.    I understand.

DR. MITCHELL CHASIN

1          A.   -- socializing on that basis.

2          Q.   When was the last time you were in

3     contact with Dr. Brodrick?

4          A.   About six weeks ago.  And prior to

5     that probably two, three -- two, three years

6     ago, something like that.  I'm not sure.

7          Q.   And what was the nature of the

8     contact six weeks ago?

9          A.   Just purely calling to say hello.

10         Q.   Where does Dr. Brodrick work

11    currently now?

12         A.   In New Jersey.  I'm not sure of

13    the town.

14         Q.   Is he practicing family

15    medicine?

16         A.   He is practicing urgent care

17    medicine.

18         Q.   What is urgent care medicine?

19         A.   It's walk-in care for -- walk-in

20    medical care, basically.

21         Q.   Is it a form of a family medicine

22    practice?

23         A.   I don't know how that's defined.

24    He is working in a walk-in -- walk-in urgent

25    care center.

DR. MITCHELL  CHASIN

Page 23

1          Q.      It's not an emergency room

2    though?

3          A.      Not an emergency room.

4          Q.      It would be similar services that

5    a family doctor would provide in a family doctor

6    practice or family medicine practice?

7          A.      Some of them.  But others,

8    atypical -- more hands-on procedures than you

9    would see in a typical family practice.

10         Q.      For example?

11         A.      Suturing, repairing wounds, eye

12   injuries, more trauma, more dermatological

13   procedures, more hands-on things.

14         Q.      Do you know when he started

15   working in that capacity?

16         A.      When he started working at that

17   present center?

18         Q.      Yes.

19         A.      No, I do not.

20         Q.      What did you guys do together when

21   you started your practice -- your family

22   practice together, you and Dr. Brodrick?

23         A.      What did we do together?

24         Q.      Yes.

25         A.      Can you rephrase that?

DR. MITCHELL CHASIN

Page 24

1          Q.    What kind of practice did you have
2     together?
3          A.    Urgent care center.
4          Q.    You guys had an urgent care center
5     together?
6          A.    Yes.
7          Q.    What year are we talking about?
8          A.    1988 or '89.
9          Q.    And for how long did you guys work
10    together?
11         A.    Until we separated.  I'm not sure
12    of the exact year that we separated.  2005, '06,
13    '07, '08.  Somewhere in that vicinity.  I don't
14    remember the exact year.
15         Q.    But around 2005, you would say?
16         A.    I don't know.
17         Q.    It was in the 2000s?
18         A.    It was in the 2000s.  I am happy
19    to supply that information to you.
20         Q.    And what was the name of your
21    practice in 1989?
22         A.    Priority Medical Care.
23         Q.    What kind of services did you
24    offer in that practice?
25         A.    Walk-in care for anything from

DR. MITCHELL  CHASIN

Page 25

1    orthopedic injuries to skin conditions to eye

2    injuries to infectious disease care.

3         Q.    Would you describe it as a

4    family medical practice?

5         A.    An urgent medical facility.

6         Q.    Just so we don't get tied down on

7    terminology, both you and Dr. Brodrick were

8    trained in family medicine; correct?

9         A.    Correct.

10        Q.    So maybe you can help me, when you

11   say "urgent care" --

12        A.    That is the office we opened.

13   Priority Medical, it was an urgent medical

14   practice, urgent care medical practice.  That's

15   the name.

16        Q.    I'm sorry.  I'm interrupting you.

17              And physicians that would work in

18   that capacity would typically be internists

19   or --

20        A.    Could be family medicine.  Could

21   be family medicine.  It's a type of practice.

22   It's not a type of physician.  It's a type of

23   practice.

24        Q.    And, of course, as a family

25   medicine -- as a doctor who is trained in family

DR. MITCHELL CHASIN

```
1    medicine, you were perfectly qualified to
2    provide those services --
3             A.    Yes.
4             Q.    -- fully?
5             A.    Yes.
6                   MR. PARADISE:   Dr. Chasin, if you
7    could just try to let Mr. Keyhani finish his
8    question and then answer.  I am seeing grimaces
9    from the court reporter.
10                  THE WITNESS:   Okay.
11   BY MR. KEYHANI:
12            Q.    And you said the name of the
13   practice was called Priority Medical --
14            A.    Priority Medical Care.
15            Q.    And that was based out of what
16   town?
17            A.    Bridgewater, New Jersey.
18            Q.    Did you do any cosmetic work in
19   that practice?
20            A.    Define "cosmetic work."
21            Q.    Well, did you do face lifts or
22   some kind of laser treatment?
23            A.    We didn't do --
24            Q.    You are the doctor so -- any kind
25   of skin cosmetic work did you do?
```

DR. MITCHELL CHASIN

1          A.      Skin cosmetic work, yes.

2          Q.      What kind of skin cosmetic work

3     did you do at that urgent care practice?

4          A.      The urgent care practice was one

5     part of that practice.  There was another part

6     of that practice that was developed called

7     Reflections Center for Skin and Body.  So as

8     part of Reflections Skin and Body, there were

9     cosmetic treatments that were performed.

10         Q.      That was a separate --

11         A.      A d/b/a.  It was a d/b/a.

12         Q.      Please let me finish my questions,

13     kindly.

14              Was that a separate business

15     housed in the same office?

16         A.      Describe business -- what is a

17     business?

18         Q.      Well, was it a separate practice

19     housed in the same building?  Did you provide

20     those services in the same building?

21         A.      Those services were initially

22     performed -- yes.  The services were provided in

23     the same building, yes.

24         Q.      Did the name Reflections -- did

25     you say Reflections Skin?  What was it called at

DR. MITCHELL CHASIN

1    the time?

2              A.      Reflections Center for Skin and

3    Body.

4              Q.      Was there a sign outside the

5    building or in the office that said Reflections

6    Center for Skin and Body?

7              A.      Yes.

8              Q.      So when you walked into the office

9    were there two signs, one that said Priority

10   Medical Care, one said Reflections Skin Center

11   for Skin and Body?

12             A.      There were two separate signs,

13   yes.

14             Q.      At the same front desk that you

15   walked in?

16             A.      The front of the building had two

17   separate signs and two separate entrances.

18             Q.      On the same floor?

19             A.      On the same floor.

20             Q.      And did you work in these two

21   practices at the same time?  Like, you moved

22   between the two sides of the floor, for example?

23   See one patient, for example, that had an urgent

24   medical care issue, and then you'd walk across

25   and go to the side to deal with --

DR. MITCHELL CHASIN

1      A.      For a period of time.

2      Q.      For what period of time?

3      A.      I don't remember exactly.  But it

4   was a period of time that I saw patients in the

5   medical as well as the cosmetic side of the

6   practice.  And then it became primarily the

7   cosmetic part of the practice, my time.

8      Q.      When did you start using -- when

9   did you start -- when did you come up with that

10   name and start using the name -- break it up

11   into two parts.

12                      When did you start using the name

13   Reflections Center for Skin and Body in that

14   practice?

15      A.      Approximate year 2000.

16      Q.      So from 1989 through about 2000,

17   Priority Medical Care was not doing any cosmetic

18   work, it was focused on, as you call it, urgent

19   medical care?

20      A.      I can't say that it did no

21   cosmetic work.  We might have done cosmetic work

22   during that --

23      Q.      But there was no Reflections Skin

24   Center?

25      A.      Correct.

DR. MITCHELL CHASIN

1    Q.    What type of cosmetic work would

2  you have done between 1989 and 2000 before

3  you --

4    A.    Skin disease, suturing repair of

5  wounds.  A multitude of skin issues.

6    Q.    Any plastic surgery did you do at

7  that time?

8    A.    Describe plastic surgery for me,

9  define it.  What a layperson defines may be

10  different.

11    Q.    Sure.  Fair enough.  Did you do

12  any type of invasive medical procedures on the

13  face or body for aesthetic purposes?

14    A.    Suturing was an aesthetic medical

15  procedure on the face and body.  We did that,

16  yes.

17    Q.    You would agree that suturing is

18  not always --

19    A.    Aesthetic?

20    Q.    -- aesthetic?

21    A.    Suturing is always aesthetic.

22    Q.    In your view, suturing is always

23  aesthetic?

24    A.    Suturing should be aesthetic on

25  the face; hopefully it is.

DR. MITCHELL CHASIN

1          Q.     Do you believe suturing is a
2    cosmetic procedure?
3          A.     Repair of a skin wound on the face
4    is a cosmetic procedure, yes.   Should be.
5          Q.     So you said that around 2000 is
6    when you -- it was about 2000 when you started
7    to use the name Reflections Center for Skin and
8    Body, and you put a sign up at that time at this
9    office?
10         A.     I don't remember when the sign was
11   installed, but we started to use that name right
12   around the year 2000.
13         Q.     Now, you indicated that you did
14   your residency in family medicine.   And after
15   that what other training in the medical
16   procedures did you obtain or medical practice
17   did you obtain after your residency in family
18   medicine?
19         A.     What other training in family
20   medicine post -- can you --
21         Q.     Any medical training?
22         A.     Any medical training?
23         Q.     Yes.   Let's start with --
24         A.     Hundreds of conferences, dozens of
25   preceptorships, a multitude of

DR. MITCHELL CHASIN

1   hands-on -- hands-on training in a variety of

2   different things about the human body.

3          Q.     Okay.  I am trying to get some

4   chronology here.  After that, did -- you didn't

5   do any fellowships, medical fellowships, after

6   your family medicine residency, did you?

7          A.     No.

8          Q.     You didn't do any additional

9   residencies after your family medicine

10  residency?

11         A.     No.

12         Q.     You are not a plastic surgeon?

13         A.     No.

14         Q.     You are not board-certified in

15  plastic surgery?

16         A.     No.

17         Q.     Did you ever do any residency in

18  surgery, general surgery?

19         A.     No.

20         Q.     Did you do any other residency in

21  any other specialty or practice other than your

22  residency in family medicine?

23         A.     No.

24         Q.     So now you spoke about much

25  training.  Can you tell me your first or your

DR. MITCHELL CHASIN

Page 33

1   first few types of training you did after --

2          A.    If I can go back.  I have titles

3   of fellow in different organizations.

4          Q.    But my question was very specific,

5   if you did a fellowship.  And you know what that

6   means in your practice, in --

7          A.    Tell me what it means and I will

8   know how to answer.

9          Q.    Why don't you tell me for the

10  record so there is no confusion, what is a

11  medical fellowship for medical doctors?

12         A.    There is a residency -- there is a

13  residency -- there is residency, there's

14  fellowship, and then there are fellowship in

15  organizations.

16         Q.    Understood.

17         A.    I want to be clear.

18         Q.    I am talking about residency,

19  fellowship.  And then we can leave aside

20  fellowship in organizations, which is a separate

21  category, you would agree, right?

22         A.    Yes.  I just wanted to be clear.

23         Q.    I appreciate that.  Because we

24  don't want to have any confusion for the record.

25               So after your family -- your

DR. MITCHELL CHASIN

1    residency in family medicine, you then went on

2    and you mentioned that you did -- you have had

3    much training in seminars, conferences, various

4    other kinds of experiences.

5              A.    Uh-huh.

6              Q.    Can you describe some of the early

7    training you had after your -- whether they were

8    classes, whether they were conferences, that you

9    had after your family medicine residency, the

10   earlier ones?

11             A.    A multitude that would probably

12   take us to the end of today.  But they included

13   conferences in the American Society of Laser

14   Medicine and Surgery, conferences in American

15   Academy of Dermatology, laser training directly

16   from manufacturers, hands-on training from

17   injectable manufacturers, networking events with

18   training, preceptorships in doctors' offices,

19   training in doctors' offices, et cetera,

20   et cetera, et cetera.

21             Q.    And if you were to describe the

22   focus, if there is, of the various training,

23   your post-family medicine residency training in

24   these various conferences and other forms of

25   training, what would be the focus of the

DR. MITCHELL CHASIN

1    training, if there is one particular focus?

2              A.      Cosmetic medicine.

3              Q.      Can you define cosmetic medicine?

4    Because you said even a suture is cosmetic

5    medicine.  So what do you mean by cosmetic

6    medicine?

7              A.      Cosmetic medicine is the art and

8    action to improve the cosmetic appearance of

9    patients, both nonsurgical as well as surgical.

10             Q.      And what particular procedures did

11   you get training in?

12             A.      Since 1989?

13             Q.      Yeah.

14             A.      How much time do you have?

15             Q.      Well, I mean --

16             A.      I want to know how extensive.  I

17   can start now --

18             Q.      You can give me the ten or five

19   biggest or most significant training you had.

20             A.      Injectable, injectable treatments,

21   laser medicine, liposuction, resurfacing

22   procedures, regenerative medicine procedures,

23   non-skin-based laser procedures,

24   non-facial-based laser procedures.  Those are

25   just some main categories.

DR. MITCHELL CHASIN

1        Q.      Fair enough.  Good.

2                Are you familiar with the term

3     "invasive" versus "noninvasive" medical

4     procedures as a medical doctor?

5        A.      As a medical doctor, yes.

6        Q.      Can you define what the

7     distinction is as a medical doctor?

8        A.      Most people today consider

9     invasive procedure as one that involves general

10    anesthetic, performed under general anesthesia.

11       Q.      Most medical doctors would

12    consider that?

13       A.      That's how I define an invasive

14    procedure.

15       Q.      Invasive procedure.  Do you engage

16    in any invasive -- yourself, do you practice any

17    invasive medical procedures?

18       A.      No.  If defined as procedures

19    performed under general anesthesia, no.

20       Q.      Have you heard or are familiar

21    with the term "minimally invasive"?

22       A.      Yes.

23       Q.      Can you tell us for the record

24    what does that mean from the perspective of one

25    in the art?

DR. MITCHELL CHASIN

Page 37

1          A.     So minimally invasive procedure
2     generally refers to a procedure that is done
3     underneath the skin using local anesthesia while
4     a patient's awake.
5          Q.     Do you perform minimally invasive
6     procedures?
7          A.     Yes.
8          Q.     Can you tell me what minimally
9     invasive procedures you perform or have
10    performed?
11         A.     As a generalization or individual
12    procedures?
13         Q.     Individual procedures.   What type
14    of minimally invasive procedures you perform or
15    have performed?   Not necessarily today, but over
16    time.
17         A.     Laser-assisted liposuction,
18    ultrasound-assisted liposuction, power-assisted
19    liposuction, tumescent liposuction, ThermiTight,
20    tightening for skin, under the skin, Precision
21    TX tightening for skin, cellulite treatment for
22    cellulite.   Should I keep on going on?
23         Q.     Sure.
24         A.     There are procedures done with fat
25    transfer underneath the skin.   There's

DR. MITCHELL CHASIN

1    platelet-rich plasma which is injected

2    underneath the skin.   There are procedures that

3    involve processing of fat into components

4    injected underneath the skin.   There are

5    procedures for leg veins that are provided

6    underneath skin.   I can keep on going on and on.

7           Q.    That's fine.  Thank you.

8           A.    These are minimally invasive.

9           Q.    And you are under local anesthetic

10   for these procedures?

11          A.    Yes.  Everything is under local

12   anesthetic if anesthesia is necessary.

13          Q.    Thank you.  Who came up with the

14   term Reflections?

15          A.    I did.

16          Q.    When did you come up with that

17   term?

18          A.    Somewhere around the year 2000.   I

19   don't know exactly.

20          Q.    Did you ever use the term by

21   itself or did you only use it in connection with

22   the name Reflections Center for Skin and Body?

23          A.    Reflections as an abbreviation of

24   the term I'm sure has been used, I've used.

25          Q.    On marketing materials at your

1   office?  On business cards?

2        A.     Business cards normally it would

3   be Reflections Center for Skin and Body.  But

4   Reflections is a term that would commonly be

5   used as a shortcut to that, as a descriptor of

6   the name.

7        Q.     Did you use that -- do you

8   recollect using that in any particular marketing

9   material?  When I say "that" I mean the word

10  just "Reflections" by itself.

11       A.     I can't tell you exactly which

12  document.  But it wouldn't -- it would be -- it

13  wouldn't be an unusual thing to use the title

14  Reflections rather than the full wording --

15       Q.     But you don't recall --

16       A.     -- rather than the full

17  descriptor.  So it would not be unusual to use

18  the term Reflections to describe our office.

19       Q.     Do you recall -- do you have any

20  documentations or recall any time that you

21  specifically used the term Reflections by

22  itself?

23       A.     I don't have documentation on me.

24  But that would be a common thing for us to do,

25  to speak about our office as Reflections, to use

DR. MITCHELL CHASIN

1    that terminology as Reflections.

2              Q.    Do you believe you have any

3    documentation -- I'm not finished with my

4    question, please.

5              Do you believe you have any

6    documentation, not on you right now but

7    anywhere, where you only use the term

8    Reflections in connection with your practice or

9    services by itself?

10             A.    I haven't searched for it.  I

11   haven't been asked to search for it.  I haven't

12   searched for it.

13             Q.    But you may very well have that?

14             A.    I don't know.  It certainly would

15   be something that we would use and talk about as

16   a descriptor for the practice.  But in terms of

17   maintaining old documents, I would have to look.

18   I just don't know.

19             Q.    I believe you were asked for it.

20   So I would like to make a point on the record

21   that we would like any documentation, production

22   of any documentation of any marketing,

23   advertising, letterhead, or any other documents

24   that use the term Reflections by itself in

25   connection with products or services that you

DR. MITCHELL  CHASIN

Page 41

1    offer.
2                    MR.  PARADISE:   And we'll take that
3    request under advisement.
4                    MR.  KEYHANI:   Thank you.
5                    (REQUEST)
6    BY MR.  KEYHANI:
7        Q.    You said on or about 2000 you came
8    up with the term Reflections to be used in
9    connection with Reflections Center for Skin and
10   Body as a name for this practice that you
11   described.  Is that correct?
12       A.    Yes.
13       Q.    At that time did you register any
14   trademark for that -- for the name Reflections
15   Center for Skin and Body?
16       A.    Yes.
17       Q.    Where did you register that?
18       A.    In New Jersey.
19       Q.    Did you register that or did
20   somebody else?
21       A.    We had a law firm do that.
22       Q.    Now, there are some documents that
23   you've produced that show some assignment of the
24   term Reflections, the trademark that you
25   registered in New Jersey to various entities.

DR. MITCHELL CHASIN

Page 47

1   I think you indicated that there was this entity

2   called Reflections Center for Skin and Body that

3   goes back to about 2000?

4          A.     Correct.

5                 MR. PARADISE:   Objection to form.

6   He never identified it as an entity.  You are

7   testifying, you are changing testimony.

8          Q.     I'm not talking about a legal

9   entity.  I am talking about an entity, a

10  business entity.  You called it a d/b/a?  Is

11  that what you called it?

12         A.     I would call it a d/b/a.

13         Q.     Doing business as?

14         A.     Yes.

15         Q.     And it was a practice, you called

16  it; right?  A medical practice?

17         A.     There were a group of services

18  provided in that -- at that address.

19         Q.     With that name, you said?  Using

20  that name?

21         A.     Under the name Reflections Center

22  for Skin and Body, correct.

23         Q.     And those services, you said, were

24  provided under the name Reflections Center for

25  Skin and Body?

DR. MITCHELL  CHASIN

Page 48

1          A.     Correct.

2          Q.     On or about 2000?

3          A.     Correct.

4          Q.     Why is there no reference to that

5    name in this document?  Do you have an answer

6    for that?  Do you know?  Maybe you don't know,

7    but I'm just asking you if you do.

8          A.     I don't know specifically.

9          Q.     And now this document appears to

10   be signed August of 2011.  I am just looking at

11   the document itself.  8/11/2011.  Is that right?

12   If you go to the next page, actually, your

13   signature says August 1, 2011.

14         A.     Okay.

15         Q.     Do you know why that the -- this

16   New Jersey registered -- these New Jersey

17   registered marks that are referenced in

18   this -- I am not asking for a legal

19   interpretation, I am just asking you, you

20   being -- you being a participant in this deal or

21   this assignment by signing it, do you understand

22   why they were assigned over to you -- or

23   assigned not to you, were assigned to

24   Reflections of Livingston in 2011, why at that

25   point in time?

DR. MITCHELL CHASIN

Page 54

1    year ago.  Right?  This is last year.

2            A.    Are you asking if it

3    is -- 11/1/16.

4            Q.    Yeah.  I guess --

5            A.    A year.

6            Q.    You don't remember.  That's not

7    very long ago.  Is there any reason why you

8    don't think you would remember signing it?

9            A.    I don't have the memory.  I sign a

10   lot of forms.  If you ask me what it is, it is

11   assignment from Reflections of Livingston to

12   Reflections Center for Skin and Body.

13           Q.    Do you know why you would have

14   done this, to assign from Reflections of

15   Livingston --

16           A.    These are two entities of which I

17   have ownership, or had ownership, I should say.

18   Had or have.

19           Q.    Do you own an entity called

20   Reflections of Livingston LLC right now?

21           A.    I think -- we have two locations.

22   One location was Reflections of Livingston in

23   Livingston under the -- I think it's one parent

24   company now, Reflections Center for Skin and

25   Body.

DR. MITCHELL CHASIN

1          Q.     So you believe you own an entity

2     called Reflections of Livingston LLC?

3          A.     Reflections of Livingston is an

4     entity that I definitely owned.  I don't know if

5     it's an active thing or if they've been merged

6     into one, one entity.  So I was a sole owner, at

7     least at one point, of Reflections of

8     Livingston.

9          Q.     And you don't know why you may

10    have transferred a trademark between the two

11    entities?

12         A.     I would think at the advice of

13    counsel.

14         Q.     What kind of services does

15    Reflections of Livingston LLC provide or

16    provided?  Because you don't know if you

17    still --

18         A.     Same -- same services as we

19    described before.

20         Q.     The same services that Reflections

21    Center for Skin and Body provides?

22         A.     Correct.

23         Q.     Originally when you -- when the

24    registration -- a New Jersey registration was

25    filed for the word Reflections, was that

DR. MITCHELL CHASIN

1   something that you did or was that something

2   your partner did?  Your partner being

3   Dr. Brodrick.

4          A.    Our attorneys filed.

5          Q.    I understand.  But was that at

6   your request?  Was it at your partner's

7   request?

8          A.    I don't recollect.

9          Q.    Do you know if your partner,

10  Dr. Brodrick, had any interest in the trademark

11  Reflections?

12             MR. PARADISE:  Objection to form.

13         Q.    Economic interest?  Money interest

14  in it?  Did he have ownership in it?

15         A.    At the time -- at the time he was

16  a 50 percent partner.

17         Q.    Do you know when this was

18  assigned, and again, this is a 2011 document we

19  are looking at, 02 -- page 22, Bates number 22,

20  did you pay him any money or any other

21  consideration for him to transfer this over or

22  to sign this transfer?

23             MR. PARADISE:  Objection to form.

24         A.    No.

25         Q.    You did not?

DR. MITCHELL  CHASIN

Page 57

1          A.        Not to my recollection, no.

2          Q.        Did you ask him to sign this

3     document?

4          A.        Not to my recollection.   I don't

5     remember this document being signed.

6          Q.        Do you know if you did -- you or

7     your attorneys at the time that -- I say your

8     attorneys, the attorneys for the entity Priority

9     Medical Care PA, which was in existence at the

10    time that this registration, New Jersey

11    registration 20852, was filed for, do you know

12    if any search was done, any trademark search was

13    done at that time?

14         A.        Prior to filing for a

15    registration?

16         Q.        Yes.

17         A.        You are asking me what does an

18    attorney do before they file?  How would I --

19         Q.        I asked did you do a search or did

20    you ask your attorney or anybody else who

21    requested that search on behalf of your

22    practice, asked for a --

23         A.        We asked our attorneys -- we had

24    interest in a name and asked if that's something

25    that we could trademark.

DR. MITCHELL CHASIN

Page 92

1    applied for by our law firm, and the renewals

2    are done by our law firm.

3            Q.     It says -- under the Reflections

4    part it says "Skin and body treatment services,

5    including microdermabrasion, body/skin

6    treatment, massages, et cetera." Those were the

7    services that Reflections of Livingston LLC

8    provided --

9            A.     Yes.

10           Q.     -- in 2001?

11           A.     Yes.  Which is exactly what we

12   said before, same set of services in both

13   practices.

14           Q.     Was there any offering of any

15   plastic surgery services as you defined plastic

16   surgery at that time?

17           A.     Yes.

18           Q.     Plastic surgery was being offered

19   in 2001 by the Reflections of Livingston?

20                  MR. PARADISE:  Objection to form.

21           A.     I don't remember the -- I don't

22   recollect the date that Reflections of

23   Livingston LLC was created.  But Reflections of

24   Livingston LLC provided same sets of services

25   that Reflections Center for Skin and Body do.

DR. MITCHELL  CHASIN

1    Board of -- you know, the general terminology of

2    plastic surgery encompasses both invasive and

3    noninvasive treatments for changing the

4    aesthetic, but also includes medical-based

5    procedures in addition.

6         Q.    In 2001, were you engaging in

7    plastic surgery as part of your practice at your

8    office?

9         A.    Define plastic surgery for me.

10   You keep on asking plastic surgery --

11        Q.    Would you advertise in your -- on

12   your website or any literature --

13        A.    2001 we were performing laser hair

14   removal, microdermabrasion, skin and body

15   treatments, as the mark says, yes.  We were

16   supplying those services in 2001.

17        Q.    And would you have represented to

18   the public and to patients that you also provide

19   plastic surgery services at that time?

20             MR. PARADISE:  Objection to form.

21        A.    I just defined plastic surgery by

22   those services.  Those are the services that we

23   would have offered.

24        Q.    You can define it however you

25   want.  I am asking, would you disclose to the

DR. MITCHELL CHASIN

1  terminology you are asking about, which is

2  plastic surgical services, prior to us hiring

3  the current plastic surgeon at our practice,

4  yes.

5          Q.    Is that permissible in terms of

6  advertising for a medical doctor to

7  advertise -- I am asking a question -- to

8  advertise that you provide plastic surgery

9  services even though one is not -- has not gone

10 through training in plastic surgery or one has

11 not go through residency in plastic surgery?

12          MR. PARADISE:  Objection to form.

13          THE WITNESS:  I have an objection.

14 I can't answer that question because it's not a

15 proper question.

16          MR. KEYHANI:  Repeat the question.

17          THE WITNESS:  You made a

18 statement.  That wasn't a question.

19          MR. KEYHANI:  Well, you can

20 clarify, what is the problem you have with the

21 statement.

22          Repeat the question, please.

23          (The record was read as follows:

24          "QUESTION:  Is that permissible

25     in terms of advertising for a medical

DR. MITCHELL CHASIN

Page 99

1    doctor to advertise -- I am asking a

2    question -- to advertise that you provide

3    plastic surgery services even though one

4    is not -- has not gone through training

5    in plastic surgery or one has not go

6    through residency in plastic surgery?")

7         THE WITNESS:  The question

8    is -- I'm not going to answer that question.

9    Because, number one, there were plastic

10   surgeon -- plastic by residency trained plastic

11   surgeons as part of our practice that preceded

12   the present -- the present plastic surgeon

13   that's in our practice.

14   BY MR. KEYHANI:

15        Q.    Okay.  That's all.

16        A.    Back in the early 2000s we had

17   plastic surgeons there.

18        Q.    Fine.  But if you did not have a

19   physician who had training and residency and

20   plastic surgery, would it be -- would it be

21   permissible for you to advertise in your

22   practice --

23        A.    Yes.

24        Q.    -- that you offered plastic

25   surgery services even though nobody in your

DR. MITCHELL CHASIN

Page 100

1    office had residency training in plastic
2    surgery?  That's the question.
3                MR. PARADISE:  Objection to form.
4          A.     Plastic surgical services, number
5    one, as I've defined, I just defined.  So, yes,
6    those services which fit in the category of
7    plastic surgical services have nothing to do
8    with training of the individual.  So is that
9    legal?  I'm not an attorney, but I would think
10   that certainly is legal and customary and the
11   standard of care, yes.
12          Q.    I guess my question is not how you
13   define plastic surgery.  I am asking --
14          A.    If you define plastic surgery I
15   will tell you --
16          Q.    I am asking is it as a medical
17   doctor -- you are a medical doctor and you know
18   your ethical and legal obligations as a medical
19   doctor, I assume, or at least you have an
20   understanding about them.
21          A.    Yes, I do.
22          Q.    As a medical doctor, as a
23   well-trained medical doctor --
24          A.    Yes.
25          Q.    -- is it appropriate -- I don't

DR. MITCHELL CHASIN

1    procedures?  Like products that you need to use

2    or any kind of instruments, products?  Things

3    like -- that are, like, get disposed of once

4    your procedure --

5              A.    There are a number of categories.

6    There equipment service expense.  There's

7    service contracts which go into the use of

8    machinery there.  There's surgical supplies.

9    There's -- I'm looking for equipment expense.

10   So there's a multitude of categories that seem

11   to speak to your -- answer to your question.

12              MR. KEYHANI:  How about we take a

13   little break here, if that's okay.

14              MR. PARADISE:  Sure.

15              MR. KEYHANI:  Thank you.

16              THE VIDEOGRAPHER:  Off the record

17   4:30 p.m.  This is the end of media unit 2.

18              (Break taken.)

19              THE VIDEOGRAPHER:  Going back on

20   the record 4:59 p.m.  This is the beginning of

21   media unit 3.

22   BY MR. KEYHANI:

23              Q.    Dr. Chasin, when did you first

24   become aware of the plaintiff in this case?  And

25   when I say "the plaintiff," I mean New

DR. MITCHELL CHASIN

Page 114

1  Reflections Plastic Surgery LLC.

2          A.      Roughly April of '16, roughly.

3          Q.      How did you become aware of

4  their --

5          A.      Our director of marketing noticed

6  it searching through the -- on the internet.

7  That's how she became aware of it.

8          Q.      How do you search for competitors

9  in your business?

10              Let me ask you, do you search for

11  competitors in your business?

12          A.      Do I or the office?

13          Q.      I don't mean you personally, but

14  people that work with you.  How do you go about,

15  I guess, figuring out who your competitors are

16  in your market space?  When I say you --

17          A.      Google pretty much controls the

18  universe at this point.  So if search

19  terms -- if search terms reveal different

20  individuals from the search query, you know,

21  they can be online competitors.

22          Q.      So what kind of Google search

23  terms do you use or does your marketing use to

24  find competitors in your practice?

25          A.      I wouldn't know specifically what

DR. MITCHELL  CHASIN

1  terms, but any term relating to the procedures

2  that are provided.  So it could be "liposuction

3  New Jersey," it could be "Reflections Botox," it

4  could be -- anything.  It can have the name of

5  the practice, which is consistent with the

6  branding.  It could be someone searching by a

7  procedure that they are interested in.

8          Q.    So generally by name of a

9  procedure would be the way they would search?

10         A.    After 20 years, close to 20 years

11  of doing this, very often they are searching by

12  name of practice.  So all the effort and money

13  that's gone into branding, people will search

14  "Reflections."  That's -- there's less word of

15  mouth in a lot of these, and the internet has

16  dominated the information.

17         Q.    They would just look for the term

18  "Reflections"?

19         A.    "Reflections," and looking for --

20  if someone was having Botox, they may look at

21  "Reflections Botox."  They may look at

22  "liposuction" and the state.  They may

23  look -- there is a variety of different ways.

24              If the question is about

25  competitors, it's basically who comes up when

DR. MITCHELL CHASIN

1  people search.

2          Q.     Prior to 2016 -- April 2016, did

3  you or anybody working for you search search

4  terms relating to Reflections on Google or any

5  other search engine?

6          A.     I'm not aware of that.  I'm not

7  aware.  I can't answer that, whether they did or

8  didn't.

9          Q.     Did you ever search before

10  2016 --

11          A.     I have no recollection of putting

12  in "Reflections" and searching for our name.  I

13  don't have a recollection of that.

14          Q.     No recollection of doing a search

15  on "Reflections" prior to 2016?

16          A.     Correct.

17          Q.     What about doing searches on the

18  internet, Google or some other search engine,

19  for other procedures like you mentioned?  Did

20  you do any of that, or somebody else working for

21  you?

22          A.     Generally it's the marketing

23  individuals, that's part of my understanding,

24  searches.  And where you show up -- it's mostly

25  where -- what kind of numbers you are showing up

DR. MITCHELL CHASIN

Page 117

1    organically on a search, that's something that
2    they would typically report on.
3              Q.    And over the past decade you or
4    other people working for you have never searched
5    and located the plaintiff's practice?
6              A.    The first time it was brought to
7    my attention was April of 2016.
8              Q.    Would it be surprising to you that
9    the plaintiff's name was -- practice was highly
10   optimized on Google years before?
11             MR. PARADISE:   Objection to form.
12             A.    How do you -- what does that mean,
13   they are highly optimized?  I don't know --
14             Q.    I will use the term -- they spent
15   a lot of money on internet marketing with Google
16   to get the ratings, to get -- to be placed high
17   up.
18             A.    Was that in a paid search?  Was
19   that organic search?  Was there SCO?  Were there
20   inbound lanes?  There is a whole science -- if
21   you tell me what they were doing I will tell you
22   whether it seems that they were adhering to the
23   standard of care and should have done better.
24   But I don't know what that means.
25             Q.    Well, all of the above.  They are

DR. MITCHELL CHASIN

1    hiring the same type of individuals that do this

2    kind of search engine optimization, let's

3    say --

4              A.      What level were they doing that?

5    You are asking me --

6              Q.      The question is, I guess, would it

7    be surprising to you that they were highly

8    ranked on the various factors -- they were

9    easily accessible on the internet before April

10   2016?

11                    MR. PARADISE:   Objection to form.

12             A.      What does that -- you are making a

13   statement, you are not asking.   You are telling

14   me -- are you asking me -- I would have

15   thought --

16             Q.      I am asking you -- would that be

17   surprising to you is the question?

18                    MR. PARADISE:   Objection to form.

19             A.      I would have -- in my opinion,

20   which is just an opinion, I think they

21   are -- they have most likely ramped up their

22   efforts, used different companies.   I don't know

23   what they did.   But it seems that their -- their

24   exposure on the internet has increased.

25   So -- and good for them.   Investing in that and

DR. MITCHELL CHASIN

1    they are learning new tactics or doing new

2    things, good for them.  But my feeling is that's

3    why we are now noticing this problem, that it's

4    probably from those efforts are becoming

5    fruitful.  Which is great for them, but it's

6    caused confusion.

7           Q.    In 2009, 2010, do you recall doing

8    any Google search engine or other search engine

9    searches for the term "Reflections" or any

10   other -- you, yourself?

11          A.    I don't -- myself, that's really

12   not where I'm spending my time, honestly.

13          Q.    In 2008, 2009, 2010 period, did

14   anybody working for you do any search engine

15   searches for the term "Reflections" or other

16   procedure that you described that related to

17   your practice?

18          A.    Nothing -- to my recollection, no

19   one has presented me with searching for

20   "Reflections" and what that -- you know, what

21   that -- what kind of results they gave.  I've

22   never been produced -- I've never been handed

23   that.

24          Q.    So you are not aware of anybody

25   yourself -- first of all, you never did any of

DR. MITCHELL CHASIN

1  those searches in 2008, 2009?

2          A.     I have no recollection of doing a

3  search for -- I've done searches for my name.

4          Q.     Sure.

5          A.     But I don't have any recollection,

6  and no one is handing me a report saying I've

7  searched for "Reflections," this is what

8  it's -- this is what it's returned.  It's just

9  not something you normally would do because

10  there's usually not a competitor for your name.

11         Q.     And you never asked anybody that

12  worked for you to do any searches for

13  competitors using your name or procedures --

14         A.     No.

15         Q.     -- on the internet?

16         A.     No.

17         Q.     Not in 2008?  Not in 2009?

18  2010?

19         A.     To my recollection, I've never

20  asked someone to search for our name and see

21  what --

22         Q.     Or the term "Reflections" itself,

23  let's say?  Have you ever asked -- because your

24  name is a longer name, but you never asked

25  anybody to look for the term "Reflections" on

1    the internet in 2008, 2009, 2010?

2              MR. PARADISE:   Objection to form.

3         A.    To my recollection, I don't -- I

4    don't remember ever asking someone to search for

5    "Reflections" -- "Reflections Center for Skin

6    and Body" or "Reflections."

7         Q.    Or for any -- same question, or

8    for any procedure that you -- that your practice

9    does in that period between 2008 and 2010?

10        A.    Searching -- that is --

11        Q.    For terms like the various

12   procedures that you mentioned earlier that --

13        A.    It would be customary -- can I

14   jump in, or no?

15        Q.    Yes, go ahead.

16        A.    It would be customary for us to

17   look for search results for procedures that we

18   do, yes.

19        Q.    It would be.  For procedures you

20   do?

21        A.    Sure.

22        Q.    And you would have done that in

23   2009 and 2010?

24        A.    Yes.  I would think we were

25   looking -- I mean, search engine -- search

1  engine in -- we are talking about seven years

2  ago, looking at results of search engine queries

3  would be something that we would be doing seven

4  years ago.  Yeah.

5          Q.    At that time you would be looking

6  for terms that relate to procedures that you

7  provide?

8          A.    Yes.

9          Q.    And what are the terms that would

10  be used?  The word "New Jersey" and

11  "liposuction," for example?

12          A.    Yeah, that would be an example.

13          Q.    Would it be more specific for a

14  city or just be -- just for the state,

15  New Jersey, liposuction?

16          A.    More common -- distance with the

17  internet, it would be more common on the

18  internet to be searching more broadly.

19          Q.    Like New Jersey, liposuction?

20          A.    NJ.

21          Q.    NJ or NY, NY?  Or no?

22          A.    Or NJ.

23          Q.    But not necessarily a particular

24  town or city in NJ?  Like --

25          A.    Could -- more often you are

1    looking at -- in 2007 you were looking --
2          Q.    2009, let's say.
3          A.    2009, broader, probably would have
4    been more common back then.
5          Q.    And that's probably what you would
6    have done?
7          A.    I don't --
8          Q.    Not you personally.  You or
9    somebody working --
10          A.    You are asking -- I don't know
11    what they would have done.  But it would be
12    customary to search for NJ with procedures that
13    you do.  That's a customary thing.
14          Q.    But you never asked anybody to do
15    that for you at that time, anybody working for
16    you to do that?
17          A.    That's customary for someone that
18    is in marketing to look at search -- search.
19    And we've had companies that have done that for
20    us, that have -- you know, that have -- vendors
21    that do that and do a lot of that information.
22    So it's not done necessarily in-house.
23          Q.    And plaintiffs were never
24    identified at that time?
25          A.    No.

DR. MITCHELL CHASIN

1          Q.    Are you a member of any
2     association of plastic surgeons -- that have
3     plastic surgeons in New Jersey?
4          A.    Sure, yes.
5          Q.    Which ones are you?
6          A.    I'm in American Academy of
7     Cosmetic Surgery, American Society of Laser
8     Medicine and Surgery, Cosmetic Laser --
9     International Society of Cosmetic Laser
10    Surgeons, American Society of Liposuction
11    Surgery.   Others are on the tip of my tongue.
12    But there would be people that have plastic
13    surgical residency training in those as part of
14    that list, yes.
15         Q.    And you never came across --
16         A.    No.
17         Q.    -- the plaintiff or his
18    practice?
19         A.    I have not.
20         Q.    Have you sent out any cease and
21    desist letters to any other parties besides the
22    plaintiff in this case regarding trademark
23    infringement?
24         A.    Not that I can recall.
25         Q.    So the only person you sent a

DR. MITCHELL CHASIN

Page 125

1    letter to ever on behalf of your practice was to

2    the plaintiff in this case, as far as you can

3    recollect?

4            A.      I personally have not.  I mean, at

5    the --

6            Q.      I mean your lawyers.  I don't mean

7    you personally, but you or your lawyers?

8            A.      To the best of my recollection,

9    it's only that letter.  I don't know of any

10   others.

11           Q.      Who are the main competitors in

12   your practice area, would you say?  Is there

13   particular businesses that are your main

14   competitors?

15           A.      I would have to search online and

16   look at them.  But, I mean --

17           Q.      It would be online mostly you

18   could find your competitors?

19           A.      Yeah.  And they vary.  You know,

20   sometimes they will vary depending on how much

21   effort, time, money goes into making your

22   presence known.  And also, longevity.  All

23   right.  Longevity helps create exposure.  And

24   searchability.

25                   So just over time, by someone

DR. MITCHELL CHASIN

1   being active online, someone's exposure will

2   increase just by sheer time more than

3   anything.

4          Q.    Do you get a lot of -- do you get

5   a lot of your patients from referrals, or does

6   it just come up from random searches on the

7   internet, would you say?

8          A.    It's a combination.  But a lot of

9   it is internet based.  It's both, but --

10          Q.    About how much percentage would

11   you say --

12          A.    I don't know the exact number.  I

13   don't know that.

14          Q.    But both are important, referrals

15   and internet --

16          A.    The internet -- new patients, the

17   internet is -- the most common source of new

18   patients is the internet.

19          Q.    And these are people that never

20   heard of you or knew about you before?

21          A.    These are patients that have heard

22   the name of our practice and have -- the

23   branding has -- you know, has effects that reach

24   a wide distance.  So they are patients that come

25   in because they heard of us.  There are people

DR. MITCHELL CHASIN

1    document, or at least what is -- at least what

2    is represented by Plaintiff's Exhibit 6.  Go

3    back to the declaration at the end of this

4    document.

5            A.    Okay.

6            Q.    It says here that International

7    Class 44, the mark was first used as least as

8    early as December 10, 2004, and first used in

9    commerce at least as early as 12/10/2004.

10            You testified earlier that you

11    thought that your use of the name Reflections

12    Center for Skin and Body was earlier than that,

13    and you talked about it going back to more along

14    the lines of 2000.  Which date is correct?  Is

15    this date not correct here?

16            A.    This date is not correct.

17            Q.    You don't believe that this

18    declaration is yours?

19            MR. PARADISE:  Objection to form.

20            A.    I don't know what that means.  Are

21    you asking me have I completed this?

22            Q.    Yes.

23            A.    No, I did not complete this.  If

24    you are asking do I know anything about this?

25    No, I don't know anything about this.  If you

DR. MITCHELL CHASIN

1    are asking did I authorize someone to do this?

2    I have no recollection of authorizing someone to

3    do this.   If I did, 2004, there would be no

4    reason to artificially make that time less when

5    clearly -- I mean, even the state trademark was

6    registered four years before that.   It makes no

7    sense.

8           Q.    The state trademark was not

9    registered for New Reflections for Skin and

10   Body --

11          A.    Not New Reflections --

12          Q.    Excuse me.   It was not registered

13   to Reflections Center for Skin and Body, it was

14   just for the term Reflections?

15          A.    I am saying the date of that was

16   2001, if I am not mistaken.

17          Q.    That was for the term

18   Reflections?

19          A.    Correct.

20          Q.    So we are talking about here

21   Reflections Center for Skin and Body.

22          A.    But what you've told me is this is

23   a national -- this was a federal, correct,

24   and --

25          Q.    That's correct.

DR. MITCHELL  CHASIN

Page 144

1              THE WITNESS:  Are we asking what's

2    real or are we asking the declaration --

3    BY MR. KEYHANI:

4          Q.    This declaration associated with

5    this application gives a first use date.  Okay.

6    I am asking about that first use date.

7              MR. PARADISE:  Objection to form.

8    You are misrepresenting the document.

9              MR. KEYHANI:  You can object to

10   whatever you want, but you do not have a right

11   to have talking objections during the

12   deposition.  The witness can testify to whatever

13   he feels is the accurate statement.  But I am

14   asking a factual question.

15         A.    All I can answer to is the

16   question of when we started using that mark, and

17   we started using that mark right around the year

18   2000.  That's what I can testify to, which I've

19   said previously.  This form, there is something

20   here about a date of 2004.  I did not write

21   that, I did not authorize this, and I am not

22   aware of any of this.  And in terms of

23   declaration, I don't see -- I don't understand

24   the -- how these things connect.

25         Q.    So you are testifying under oath

DR. MITCHELL CHASIN

**Page 145**

1    today that you did not -- you did not endorse or

2    put forth December 10, 2004, as a date of first

3    use --

4                        Let me finish my question.

5            A.     Go ahead.

6            Q.     -- in connection with your

7    application for Reflections for Skin and Body?

8            A.     Absolutely not, I did not use a

9    date of 2004, nor -- I can't even conceive of

10   why I would do that.  That would seem to be

11   disadvantageous.  So --

12           Q.     And who unearthed and filed this

13   application?

14           A.     That's for you -- that's why I

15   asked you to show me my signature.

16           Q.     Who do you think filed this

17   application?

18                   MR. PARADISE:  Objection to form.

19           Q.     As you sit here today who do you

20   think filed this application?

21                   MR. PARADISE:  Objection to form.

22           Q.     You can answer the question.

23           A.     I don't know.  You are asking me

24   whether I did it.  I did not do it.  I did not

25   instruct our attorneys to do it.  So I'm more

DR. MITCHELL CHASIN

1    than happy for you to tell me.  But I am telling

2    you as much as I know.

3              Q.    Even though it has your name, not

4    your partner's name?

5              A.    That is not my signature.

6              Q.    I didn't say your signature.  I

7    said it has your name here and your address --

8              A.    That's different.

9              Q.    I understand.  I said it has your

10   name, your address.  And let me ask you, who is

11   Paula@ReflectionsCenter.com?

12             A.    Show me where to look.

13             Q.    At the bottom,

14   Paula@ReflectionsCenter.com.  Who is Paula?

15             A.    There was a Paula that was a

16   office manager for a fairly short period of

17   time.  I don't know the exact --

18             Q.    For who?

19             A.    For Reflections, for the practice.

20   She was an office manager, office staff.

21             Q.    And she submitted this on your

22   behalf?

23             A.    You can't do that.  You asked me

24   that three times.  Three times I said I did not

25   instruct anyone to do that, and you just asked

DR. MITCHELL CHASIN

Page 147

1    me --
2            Q.      I am asking if Paula did it on
3    your behalf?
4            A.      I never --
5                    MR. PARADISE:   Objection to form.
6            A.      -- instructed anyone to apply for
7    federal trademark.   I said that many times.   I
8    don't know what you want me to do.   So there is
9    a Paula there.   There was a Paula -- I don't
10   know that was the Paula, but there was a Paula
11   that was an office manager at our practice years
12   ago.
13           Q.      Which practice was she office
14   manager of?
15           A.      Reflections Center for Skin and
16   Body.
17           Q.      The International Class here --
18   under International Class it says -- and I've
19   heard your testimony, but it says -- my question
20   is were these the services that Reflections
21   Center for Skin and Body offered at that time?
22   And it says here health spa services, namely,
23   laser treatments for acne, rejuvenation, scars,
24   tattoo removal, and for facials and massage.
25                   MR. PARADISE:   Objection to form.

DR. MITCHELL CHASIN

1          A.      Can you just show me where I am

2      looking.

3              Did we provide those services at

4      Reflections?  Yes.

5          Q.      This is an accurate description of

6      the services provided at that time?

7          A.      That's not --

8              MR. PARADISE:   Objection to form.

9          A.      That's a -- that's some of the

10     services.   That's a fraction of, you know, the

11     services we provided.   But we did provide those

12     services.   And you said the date of this was

13     2008?   Is that what you said?

14         Q.      It says at the top here filing

15     date 10/4/2008.

16         A.      So did we provide those services

17     in 2008?   I would say yes.

18              MR. KEYHANI:   Let's take a

19     few-minute break and then we can see if we're

20     almost done.

21              THE VIDEOGRAPHER:   Off the record

22     5:35 p.m.

23              (Break taken.)

24              THE VIDEOGRAPHER:   Back on the

25     record 5:45 p.m.

DR. MITCHELL CHASIN

**Page 149**

```
 1              MR. KEYHANI:  The plaintiff at

 2   this time doesn't have any further questions

 3   unless there is some redirect and then there is

 4   some recross.

 5              MR. PARADISE:  I don't have any

 6   questions.

 7              MR. KEYHANI:  Okay.  Then we are

 8   done for the day.  Thank you.

 9              THE VIDEOGRAPHER:  Going off the

10   record 5:45 p.m.  This concludes today's

11   testimony of Dr. Mitchell Chasin.  There are

12   three media units, they will be retained by

13   Veritext.

14              (Time noted:  5:45 p.m.)

15

16

17

18

19

20

21

22

23

24

25
```